DETERMINED IN THE

## FIRST DISTRICT

OF THE

# APPELLATE COURT OF ILLINOIS

## DURING THE YEAR 1904.

Jacob Christensen, sued as George Christensen, v.
The People of the State of Illinois.
Gen. No. 11,404.

C. E. Doty v. Same.
Gen. No. 11,405.

Charles Heinig, sued as Charles Heine, v. Same.
Gen. No. 11,406.

Andrew Emerson v. Same.
Gen. No. 11,407.

Fred Wagner v. Same.
Gen. No. 11,408.

A. Mashek v. Same.
Gen. No. 11.409.

John O'Brien v. Same.
Gen. No. 11,410.

Thomas Queenan v. Same.
Gen. No. 11,411.

Lee S. Fisher v. Same.
Gen. No. 11,412.

John Brent v. Same.
Gen. No. 11,413.

Jacob Christensen v. Same.
Gen. No. 11,414.

Charles Evans v. Same.
Gen. No. 11,415.

A. Mashek v. Same.
Gen. No. 11,416.

John O'Brien v. Same.
Gen. No. 11,417.

1. RES ADJUDICATA—*how far judgment of Appellate Court is.* Upon a second appeal of a case to the Appellate Court, the judgment of such court rendered in the first appeal is *res adjudicata* as to all persons who

(40)

Christensen, et al., v. The People.

were parties to the proceeding at the time of such first appeal, not only as to questions actually decided but as to all questions which might have been decided if properly presented.

2. CONTEMPT PROCEEDINGS—*what not defense to.* In contempt proceedings where the court has jurisdiction of the parties and of the subject-matter, a defense predicated upon irregularities and errors in the proceedings antecedent to such contempt proceeding, is insufficient.

3. CONTEMPT PROCEEDINGS—*who may be reached by.* Not only parties to the proceeding in which the injunctional order was entered may be reached by proceedings to punish for contempt for the violation of such order, but, likewise, all those persons officially served with the writ of injunction or who have actual notice thereof.

4. CONTEMPT PROCEEDINGS—*when deemed civil in nature.* Where the enforcement of an injunction by contempt proceedings is in the interest and for the benefit of the complainant in the proceeding in which the injunction was issued, such contempt proceedings are regarded as civil in nature.

5. CONTEMPT PROCEEDINGS—*when sworn denial of charges made in, does not entitle respondents to discharge.* Where the respondents in a civil proceeding for contempt file sworn answers, denying the charges made against them, they are not entitled to a discharge.

6. CONTEMPT PROCEEDINGS—*when evidence upon one hearing for, may be heard upon a like subsequent hearing.* Where contempt proceedings in which conspiracy is charged have been heard, the evidence taken upon such initial hearing may properly again be considered upon subsequent like contempt proceedings in the same case, where it appears that there was but one entire conspiracy, which existed and was being carried on during the entire period covered by all of such contempt proceedings.

7. BILL OF PARTICULARS—*when not error to refuse.* It is discretionary with the court in proceedings for contempt to order or to refuse to order the filing of a bill of particulars, and, as a matter of fact, it is not the practice to furnish bills of particulars in contempt proceedings.

8. INTIMIDATION—*what deemed, in violation of strike injunctional order.* The presence of a large number of pickets with the avowed purpose of preventing complainant's employees from remaining in its employ, and those seeking employment with it to desist therefrom, is intimidation within the meaning of an injunctional order forbidding the same.

9. CONSPIRACY—*how, may be proved.* A conspiracy may be established by circumstantial evidence.

10. CONSPIRACY—*when strikers are guilty of.* Where the former employees of complainant have entered upon a strike for the purpose of compelling it to enter into an agreement which would tend to create a monopoly in favor of the members of particular unions, their concert of action is for an unlawful purpose, and where such employees act in combination in endeavoring to injure complainant's business by such unlawful purpose, an illegal conspiracy is established.

11. CONSPIRATORS—*joint responsibility of.* Each conspirator is responsible for the acts and declarations of every other conspirator in furtherance of the common design.

Contempt proceedings. Appeals from the Superior Court of Cook County; the Hon. JESSE HOLDOM, Judge, presiding. Heard in this court at the October term, 1903. Judgments in all cases affirmed except in Mashek v. The People, Gen. No. 11,416, in which judgment is reversed and judgment in the Appellate Court. Opinion filed May 12, 1904.

**Statement of the Case.** All of the foregoing appeals are from judgments finding the appellants guilty of contempt in violating an injunction issued on a bill and affidavit filed by the Kellogg Switchboard and Supply Company May 25, 1903.

The bill makes defendants Brass Workers' Union No. 27 and Richard Phalen, president, and A. C. Mathis, secretary thereof; Brass Molders' Local, and Eugene Sullivan, president, and W. P. Wallace, secretary thereof; International Brotherhood of Electric Workers' Local No. 376, and Samuel A. Grimblot, president, and James B. Wilson, secretary thereof; Chicago Metal Workers' Council No. 1; International Association of Machinists, Lodge No. 8, and A. E. Ireland, manager thereof, J. Ahlberg, and about eighty-three other persons. The bill avers the following as facts : Complainant is an Illinois corporation having its principal office in Chicago, and the defendants are all residents of Chicago. Since complainant's organization it has been engaged in manufacturing and selling telephones, switchboards and electrical supplies. Its principal place of business is at the northwest corner of Green and Congress streets, in said city, and for more than five years last past it has done business in said city and throughout the United States, has employed a local force of from 500 to 800 men and girls, and has invested more than $500,000 in machinery, patents, equipment and material. A large portion of its business is of a special character, and it has been obliged to employ numerous mechanics, a large number of whom are members of unions, and a large number of whom are not such members. A large number of its employees are,

Christensen, et al., v. The People.

as complainant is informed by its officers, satisfied with the terms of their employment; notwithstanding which, defendants, maliciously and without reasonable cause, called a strike at complainant's place of business, and forced its employees who are members of unions, and others not such members, to quit work.

About May 7, 1903, James J. Lamb, business agent of the International Brotherhood of Electrical Workers, Local 376; Lee S. Fisher, business agent of International Association of Mechanics, District Lodge; R. G. Crane, business agent of Brass Workers' Union No. 127, and J. E. Johnson, business agent of Brass Molders' Local No. 83, defendants herein, called on complainant respecting certain drafts of agreements, copies of which are attached hereto and made part hereof, and marked A, B, C and D, and insisted on their being signed by complainant's officers, and informed complainant that, unless they were so signed, the said defendants would call a strike at complainant's factory, etc. The conditions and terms of said proposed articles of agreement are so arbitrary and unreasonable that complainant refused to cause the same to be signed, whereupon said Fisher, Crane and Johnson gave notice to complainant's employees to strike, and about 500 of them immediately left complainant's employ. Since May 7, 1903, the strike has continued, etc. Prior to May 7, 1903, George Christensen, C. E. Doty, A. Emerson, Charles Evans, F. Wagner, A. Mashek, Charles Heine and John Brent, and numerous others named in bill, were in complainant's employ, but went out on said strike May 7, 1903, and thereafter surrounded complainant's place of business; stationed themselves in the streets, alleys and approaches thereto, and began a system of intimidation of the persons who remained in complainant's employ, and as such employees passed to and from their work, stopped them, and warned them not to return to work; and said defendants and other persons unknown to complainant, have continued to surround and picket complainant's place of business, and have continued a menacing and threatening attitude toward

complainant's employees, so that many of them have been frightened and intimidated, and by reason thereof have ceased to work, and complainant has thus been prevented from carrying on its business. Since said strike complainant has sought the services of others, who have endeavored to take employment with it, but have been prevented from so doing by said defendants and pickets. Said pickets and former employees of complainant are acting under the direction, instigation and advice of the officers of said labor organizations with the view of injuring complainant's business, terrifying its employees and forcing it to execute said articles of agreement. Said defendants, strikers, and others associated with them, call complainant's employees scabs, and as they pass in and out, apply opprobrious epithets and use threats toward them, etc. Complainant has numerous contracts to fill, which it can fill if permitted to carry on its business, but if interfered with as aforesaid, it will not be able to complete said contracts, whereby it will suffer irreparable loss, etc.

Other elements which, if present conditions continue, will cause irreparable loss to complainant are averred. The defendants and divers other persons unknown to complainant have formed a conspiracy against it, to prevent it from carrying on its business, etc. An injunction against the acts complained of is prayed.

The bill is verified by the oath of Wallace DeWolf, complainant's president. Some twelve affidavits were filed with and in support of the bill, and it is shown by these affidavits that former employees of complainant, who went out on the strike, were engaged in picketing and patrolling the complainant's plant before the bill was filed, and that they used persuasion, opprobrious epithets, threats and violence to prevent complainant's employees from continuing in its employ.

W. J. Robinson deposed that May 22, when he was about to enter complainant's place of business, two former employees of complainant intercepted him, and said to him, "Don't you know there is a strike there? If you insist upon working there you are taking your chances."

Robert Heinke, employee of complainant, deposed that May 22, as he was going home from complainant's place of business, five men, who were picketing said place, followed, struck, knocked him down and called him a scab.

William Barrett deposed that he was in employ of complainant. May 22, 1903, when on his way to work, Miller, a former employee, held his finger up, and when affiant showed his working card, Miller shook his fist at him, and, when he was entering complainant's factory, Stores, a former employee, intercepted him and asked him what he was working at Kellogg's for, that they were on a strike, when affiant said he didn't care, and Stores said they would make him care.

John Jorndt, special policeman, swore that constantly, since the strike, he had been patrolling about the company's premises; that nearly every day persons had been stopped by pickets and former employees of the company, and had invariably turned back and walked away in company with the pickets. Also that since May 21, 1903, the employees of the company had been yelled and jeered at, and that at least fifty of the company's former employees had been continuously picketing and patrolling in and about the company's premises, and that about fifteen girls, former employees of the company, had been similarly picketing and patrolling and had jeered at the girl employees.

Affidavit of R. Heinke, that May 21, 1903, he applied to the company for employment, and was employed by it as a machinist, and on the same day, when on his way home, Mashek and Christensen, who stood near the company's place, said to him that he had better quit work, and that if he didn't they would knock his block off and put him in the hospital.

The drafts of agreement annexed to and made part of the bill will be referred to in the opinion.

May 25, 1903, the court, on motion of complainant, entered an injunction order, in substance as follows:

The defendants and their confederates and each of their servants and agents, etc., are restrained from in any manner

interfering with, hindering, obstructing or stopping any of the business of the said Kellogg Switchboard & Supply Company or its agents, servants or employees in the operation of the business of said Kellogg Switchboard & Supply Company, in the city of Chicago or elsewhere, and also from entering upon the grounds or places where the employees of the said Kellogg Switchboard & Supply Company are at work, for the purpose of interfering with, hindering or obstructing the business of said Kellogg Switchboard & Supply Company in any manner whatsoever, and also from compelling or attempting to compel by threats, intimidation, force or violence, any of the employees of said Kellogg Switchboard & Supply Company, to refuse or fail to do their work or discharge their duties as such employees, and also from compelling or inducing or attempting to compel or induce by threats, intimidation, force or violence any of the employees of said Kellogg Switchboard & Supply Company to leave the service of said company; and also from preventing or attempting to prevent any person or persons by threats, intimidation, force or violence from freely entering into the service or employ of said company, or continuing in the service or employ of said Kellogg Switchboard & Supply Company, and also from compelling and inducing or attempting to compel or induce, by threats, intimidation, force, violence or persuasion said Kellogg Switchboard & Supply Company, against its will or the will of its officers, to employ or discharge any person or persons whomsoever, and also from doing any acts whatever in furtherance of any conspiracy or combination to restrain or obstruct either said Kellogg Switchboard & Supply Company or any of its officers and employees, in the free, uninterrupted and unhindered control and direction of its business and affairs, and also from ordering, assisting, aiding or abetting in any manner whatever any person or persons to commit either or any of the acts aforesaid, and also from congregating or being upon or about the sidewalks, streets, alleys, approaches adjoining or adjacent to the premises so occupied by the said Kellogg Switchboard & Supply Company, for

the purpose of intimidating its employees or coercing said employees, or any of its officers or agents, or preventing them or any of them from rendering their services or discharging their duties to the said Kellogg Switchboard & Supply Company, and also from inducing or coercing by threats, force, violence or persuasion any of the employees of said Kellogg Switchboard & Supply Company to leave the service or employment of said Kellogg Switchboard & Supply Company, and also from in any manner interfering with the said Kellogg Switchboard & Supply Company in carrying on its business in its usual and ordinary way, and also from in any manner interfering with or molesting any person or persons who may be employed by, or who may be seeking employment with the said Kellogg Switchboard & Supply Company, in the operation of its business, and also from either singly, or in combination with others, collecting in and about the approaches to the factory, building and place 'of business of the said Kellogg Switchboard & Supply Company, for the purpose of picketing or patrolling or guarding the streets, avenues, gates and approaches to said place of business of said Kellogg Switchboard & Supply Company, for the purpose of intimidating, threatening, coercing or persuading any of its employees, or any person or persons seeking employment with it, and also from interfering with its employees in going to and from their daily work at the place of business of said company, or wherever they may be employed in the business of said company; and also from either going singly or collectively to the homes of the employees of said Kellogg Switchboard & Supply Company, or any or either of them, for the purpose of intimidating or coercing or persuading any or all of the employees to leave the employment or service of the said company, or from entering its employment or service, and from intimidating or threatening in any manner the wives and families of said employees at their homes or elsewhere until this honorable court, in chancery sitting, shall make further order to the contrary.

A writ issued in conformity with the order of injunction.

July 3, 1903, the complainant filed a petition in the cause, stating, in substance, that, immediately after the issuance of the writ of injunction, it caused about fifty copies of it to be posted in conspicuous places on the outside walls of its building, so that it was impossible for one in the neighborhood to avoid seeing the same; and also caused notice and information of said injunction to be given as widely as possible among its employees and ex-employees and persons coming into the neighborhood, and, May 26, 1903, caused a printed copy of the writ to be mailed to each of the defendants and to each employee who had left its employment on account of the strike, and that said notices were sent to Frank Murray, Joe White, J. W. Hogan, M. J. Phalen and Charles Cronkers. Immediately after the issuance of the writ the deputy sheriff served the same on all defendants in the neighborhood, and continued service as rapidly as possible.

Frank Murray was personally served with the writ May 27, 1903, at ten o'clock A. M. Said Murray, Joe White, J. W. Hogan, M. J. Phalen and Charles Cronkers, who left complainant's employ to take part in the strike, with notice and knowledge of the writ have been picketing and patrolling complainant's place of business, intercepting persons on their way to take employment with complainant, and complainant's employees, in going to and returning from their work, and have been endeavoring, by threats, intimidation and persuasion, to induce, coerce and compel complainant's employees to leave its service, and to prevent persons seeking employment with complainant from so doing, and that the persons named herein have congregated on the streets, etc., and approaches to complainant's place of business, for the purpose of picketing and patrolling the same, and intimidating, threatening, persuading and coercing complainant's employees to leave their work and other persons to refuse to work for complainant.

The petition is verified by the affidavit of Wallace L. DeWolf, complainant's president.

June 5, 1903, the complainant filed a supplemental peti-

tion, substantially the same, in its averments of acts, as the petition filed June 3, in which it is averred, in substance, that among others who have been engaged in picketing and patrolling complainant's place of business, and interfering with workmen coming from and going thereto, are the defendants C. E. Doty, F. Wagner, E. R. Frick, Charles Heine, A. Emerson, A. Hopkins and A. Mashek, and that F. Dusek, P. Robinson, William Lynch and Adam Nesbit have, since the issuance of the injunction, picketed and patrolled complainant's place of business, and assisted the persons above named, and others, in interfering with workmen coming from and going to the factory, and endeavoring by threats, intimidation and other means, to prevent them from working for complainant. Also that George Christensen and Charles Heine were personally in court May 25, 1903, and had personal notice of the injunction order, etc.

The supplemental petition is verified by the affidavit of J. B. Edwards, complainant's superintendent. Andrew Emerson, Charles Heinig, sued as Heine, Fred Wagner, C. E. Doty, A. Mashek, Jacob Christensen, sued as George Christensen, and others, answered the petition. Emerson answered, in substance, as follows : Admits knowledge of the injunction; denies the use of threats, intimidation, coercion or violence, toward any person, or in any way, or interfering with workmen going to or leaving the factory; admits that, since the entry of the injunction order he has, during parts of each day, stood at Peoria and Congress streets, and, when he saw any one going to work for petitioner, requested permission to speak to him, and, when granted, asked such person if he knew there was a strike at the factory, and if such person refused to be talked to, he said nothing further, and that in no case has he used threats or improper language, or talked in a threatening or improper manner, but has endeavored, only by proper and lawful means and persuasive words, to inform and notify persons about to go to work of the situation at the factory, and that there was a strike on at the factory; that he is

advised and believes that, under the law, he has a right to speak to such employees, in a peaceable and proper way, for the purpose of persuading them to cease their relations with petitioner, or entering into relations with it, and that the strike has been peaceable and orderly, etc., and that no arrest was made except of a Pinkerton detective, who intimidated one of the men stationed to talk to persons going to the factory, for which said detective was arrested and fined; that the place where respondent stood was on a public street, about 300 feet from the entrance of complainant's factory, and not adjoining the same.

The answers of Heinig, Wagner, Doty, Mashek and Christensen are the same as that of Emerson, except as to the place where each of them stood. The issues are verified by the affidavits of the respondents. Numerous affidavits were read in support of the petition and supplemental petition, and such proceedings were had that June 15, 1903, the court found the appellants Jacob Christensen, C. E. Doty, Charles Heinig, Andrew Emerson, Fred Wagner and A. Mashek, and others, guilty of contempt in violating the injunction, and fined each of them ten dollars.

June 22, 1903, complainant filed another petition, in which, after stating the issuing of the injunction and the printing and giving notices thereof, as in the former petition, it is averred, in substance, that the conspiracy described in the bill has been substantially kept up by defendants and others co-operating with them; that pickets maintained by defendants have been constantly on the watch in the streets, alleys and approaches to complainant's place of business, and have intercepted complainant's employees in going to and from their work, and persons going to complainant's premises to procure work, and, in many cases, they have succeeded in intimidating and frightening away complainant's employees and persons seeking employment with it. Pickets and patrols constantly met complainant's employees, when leaving its place of business, at the close of working hours, and followed them to their homes. All this was done as part of defendants' plan to

create a reign of terror, by which employees and those seeking employment were made to understand that they were likely to incur violence, or other unlawful treatment, if they persisted in working for complainant. By reason whereof many of complainant's employees have left and others have been deterred from entering complainant's employ. Since the entry of the order of June 15, 1903, the defendants, and others associated with them in maintaining said picket and patrol, have resorted to personal assaults upon employees of complainant, and those seeking to work for it, for the purposes aforesaid, which assaults have been of common occurrence, and several of complainant's employees have been beaten and seriously injured by persons engaged in maintaining said picket. Ray Snider, complainant's employee, was assaulted by said persons June 18, 1903, in the neighborhood of complainant's place of business. David Owen, who was with Snider at said time, was kicked, beaten and injured. Mr. Hildebrandt, complainant's employee, was assaulted by persons engaged in picketing. Charles McDonald, not in complainant's employ, who was in the immediate vicinity of complainant's employees who were being molested and threatened by pickets, was assaulted, beaten and seriously injured, and among those assaulting him was A. Emerson, heretofore adjudged guilty of contempt. As a result of said system of picketing and acts of violence, the entire neighborhood of complainant's place of business is disturbed, and complainant's employees are greatly terrified, expect assault, and fear for their lives. Among those engaged in picketing and patrolling, and interfering with complainant's workmen coming to and going from its place of business, are John O'Brien, Thomas Queenan, and numerous others named in the petition. It is further averred that Charles Kreusler, George Christensen, E. R. Frick, F. Dusek, Peter Robinson, A. Emerson, William Lynch, Arthur Hopkins and A. Mashek, who were adjudged guilty of contempt June 15, 1903, have continued to assist in the maintenance of said system of picketing and patrolling complainant's place of business, and interfering

with its employees, and those seeking employment with it, and have been acting in co-operation with the other parties. Numerous affidavits are presented in support of the petition, and are made a part thereof. The petition is verified by Edwards, complainant's superintendent. In answer to a rule to show cause, O'Brien and Queenan answered as follows: Answer of O'Brien admits notice of the injunction; says he did not know the injunction prohibited him from talking to the employees, and denies intimidation, violence and threats; says he has read Jorndt's affidavit stating that he was picketing and patrolling on June 8, 9, 10, 11, 12, 13, 16, 17 and 18, 1903, and admits that, not only on said days, but on every day, with few exceptions, since the beginning of the strike, he has been in the street several hundred feet from petitioner's place of business, engaged in peaceably persuading petitioner's employees to leave its employ, and others about to take employment with it to refrain from doing so. Makes same answer to affidavit of James T. Johnson. Has seen Braunhold's affidavit in which he states that respondent said to him, "If you don't come out by night I will lick you," and denies that he used such language, and that Braunhold's affidavit is false; but that he did say to Braunhold, "You boys ought to come out and join the union; you should also try and get as many of the other boys to join the union as you can." Has seen purported copy of Richards' affidavit, and the same is false. Has been advised and believes that legally he has a right to speak to petitioner's employees and to persons seeking employment with it, and to dissuade them by peaceable words to cease their employment or refuse to take employment with petitioner. Says he is familiar with Clarence S. Darrow's letter, and has acted under his advice, and thinks he had lawful right so to do, etc.

Answer of Queenan admits notice of injunction. Denies that, since injunction issued, he has, by threat, intimidation, coercion, or violence of any sort, sought to compel any person to leave, or enter into, petitioner's employ, or that by threats, intimidation or violence, he has interfered

with any such person. He has read purported copy of Jorndt's affidavit, in which it is stated that on June 4, 6, 8, 9, 12, 13 and 15, 1903, this respondent was patrolling and picketing in the neighborhood of petitioner's place of business, and does not know in what sense Jorndt uses the terms "picketing and patrolling," but on the days mentioned, and other days, he was on the street, engaged at different times, peaceably and legally, in talking to and persuading persons, who were willing to listen, to induce such persons not to work for petitioner, or take employment with it. Has seen purported copy of McLeod's affidavit, and admits that he talked to Peter Hall as stated in said affidavit; that respondent and Hall are on terms of intimate friendship, and that respondent did not intend in so talking to him to violate the injunction, nor know that he was so doing. Respondent is advised and believes that, so far as picketing and patrolling are concerned, he has legal right to speak to the petitioner's employees and persons seeking employment with it, in a peaceable and proper manner, and to persuade the former to cease their relations with petitioner and the latter not to take employment with it. He is familiar with the letter of Clarence S. Darrow and believes that letter correctly sets forth the law, and that if the injunction restrains respondent from persuading and talking to such employees and other persons, it is void, etc.

The letter of Clarence S. Darrow, of the firm of Darrow & Masters, counsel for appellants, is as follows :

"JUNE 12, 1903.

LEE S. FISHER, ESQ., Bus. Agent International Ass'n Machinists :

DEAR SIR :—In reference to the rights of your organization and its members to patrol the streets in the neighborhood of the Kellogg Company and to persuade and advise those whom you believe are taking the place of strikers, I wish to say that under the constitution and laws of Illinois you have a right to walk the streets in the neighborhood and immediate vicinity and to speak to any person you have a right to believe is at work for said company, and to explain to the said person the cause of the strike

existing, and to ask them to desist from work, but have not a right to threaten them or use violence or force or intimidation, and if they do not desire to talk you should not pursue them or annoy them; but have a right to have men, not to exceed eight or ten, patrolling the streets and address any person as indicated, and if it is vital or necessary to the success of the strike I should advise you so to do.

C. S. DARROW."

Such proceedings were had in the matter of the petition or information filed June 22, 1903, that the court found the appellants John O'Brien and Thomas Queenan, guilty of contempt, in violating the injunction, and fined each of them one hundred dollars.

July 14, 1903, complainant filed another petition, wherein, after setting forth the filing of the bill and other prior proceedings, it is charged that appellants, Lee S. Fisher, John Brent, Jacob Christensen, Charles Evans, A. Mashek, John O'Brien, and nineteen other persons named, have, on numerous occasions, knowingly and deliberately violated the injunction, and have, almost daily, insulted and terrorized petitioner's employees, by violence, threats and indecent language, and have, by picketing petitioner's place of business and the streets, highways and approaches to the same, and the homes of petitioner's employees, greatly terrorized said employees and persons seeking employment with it, and have, continuously since June 19, 1903, patrolled in pairs and groups up and down the streets in front of and around petitioner's place of business, in plain view of said employees, and have gathered in groups near to said place of business, especially when said employees were coming to said place of business in the morning and leaving it in the evening, and intercepting and stopping said employees while they are coming to or leaving said place of business, and have assaulted and beaten, and continue to assault and beat said employees; that said respondents, some of whom are defendants to the bill and some not, are acting as leaders and advisers and cooperating with others violating said injunction, and especially under the direction of the officers of Brass Workers' Union No. 127; Brass

Molders' Local No. 83; International Brotherhood Electrical Workers' Local No. 376; Chicago Metal Workers' Council No. 1, and International Association of Machinists, Lodge No. 8. Said Fisher, Brent, Christensen, Evans, Mashek and O'Brien, and others named, and others whose names are unknown to petitioner, have, between June 19 and July 1, 1903, picketed and patrolled around petitioner's place of business, and watched, guarded and patrolled the streets, avenues and approaches to said place, and have daily shifted and interchanged their positions and companionship, and have so stationed themselves that all petitioner's employees have been obliged to pass through the picket lines so maintained, and that the attitude and appearance of said pickets has been ugly, menacing, and such as to cause fear in the minds of ordinary persons. John O'Brien on June 30, 1903, participated in a riot and, in company with a number of the strikers and their associates, followed a number of your petitioner's employees along the streets, while they were on their way to their homes from work, and joined with others, who stoned said employees and called them scabs and other opprobrious names, and, by means thereof, greatly terrified them. The petition then sets forth particular instances of intimidation by threats, warnings against working for complainant, assaults, batteries, etc. The petition concludes with the presentation of affidavits, which are made a part thereof, and with the usual prayer, and is verified by the affidavit of J. B. Edwards, complainant's superintendent.

In answer to a rule to show cause the following named appellants answered substantially as follows:

Fisher: Makes general denial, and says the affidavit of Herman Dietz is false.

Brent: Denies picketing, patrolling, or persuading since July 1, 1903, but admits that, on divers days before said day, he was, at various times, in the streets near complainant's place of business, engaged in dissuading persons seeking employment with complainant from entering its employ. Denies conspiring with any one, and says that

" *he has only agreed to assist others in making said strike effectual* by the use of peaceable means, that is, by the use of persuasion, *in order to bring about the execution of the schedule submitted to the petitioner, which this respondent insists is perfectly lawful, and is a lawful end to be attained by lawful means.*"

Christensen : Admits that, on divers days, he was on the streets near complainant's place of business, engaged in persuading its employees to quit its employ, and those seeking employment to desist therefrom, and " that he has so persuaded and talked *for the purpose of reinforcing the said strike, and of making the same effectual,* as he believes he has a right to do." Denies that he used violence, threats or intimidation, or was backed up by such. Denies entering into any conspiracy, and says " *he has only agreed to assist others in making said strike effectual,* by the use of persuasion, *in order to bring about the execution of the schedule submitted to the petitioner, which this respondent is informed and believes is perfectly lawful and is a lawful end to be attained by lawful means.*"

Evans : His answer is the same as Christensen's *nomine mutato.*

Mashek : Admits that from June 15 to July 15, 1903, he was, on divers days, in the streets near complainant's place of business, engaged in persuading complainant's employees to cease their employment, and those seeking petitioner's employment to desist therefrom. Denies violence, intimidation and threats. Denies entering into any conspiracy, and says " *that what he has done has been done as a part of the process of prosecuting the said strike, and for the purpose of attaining a perfectly lawful end, to-wit, the execution of the articles of agreement mentioned in the bill of complaint,*" and that "he believes and is advised that the law is that any lawful act done for the purpose of accomplishing the aforesaid end cannot constitute a conspiracy." He has not seen any acts of violence, if any such have occurred, and is in nowise responsible therefor, and does not approve the same, and that none of said acts of violence,

or unlawful acts, are adopted or employed by those in charge of said strike, etc.

O'Brien :   Says he was fined July 2, 1903, and supposed said fine included all supposed acts prior to that date, and that since said date he has not participated in the strike in any way, or picketed or patrolled by himself, or with any person, about petitioner's premises; that the charge that he participated in a riot June 30, 1903, etc., is false, and he expressly denies the same, and also denies that he participated in any conspiracy whatever.

The answers of appellants are all sworn to.

Such proceedings were had in the matter of the petition of July 14, 1903, that the court adjudged the following named appellants guilty and sentenced them as follows: Lee S. Fisher to pay a fine of $100; John Brent to pay a fine of $25; Charles Evans to pay a fine of $25; George Christensen to be committed to the county jail for thirty days; A. Mashek to be committed to said jail for sixty days.   On the hearing of the petition filed June 22, 1903, the court heard not only the petition and the affidavits in support of and against it, but the evidence on the hearing of the petition filed June 3, and the supplement thereto filed June 5, 1903; and on the hearing of the petition filed July 14, 1903, the court heard the affidavits *pro* and *con* said petition and all prior evidence.

DARROW & MASTERS, for appellants; ALBERT M. CROSS, of counsel.

TENNEY, COFFEEN & HARDING, and ALLEN & WESEMANN, for appellee; HORACE KENT TENNEY and JAMES H. WILKERSON, of counsel.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

The lengthy statement preceding this opinion has been made for the reason that other appeals from the judgments mentioned in the statement are pending here, and so that this opinion may, in part at least, apply to such other ap-

peals. The appellants, Jacob Christensen (sued as George Christensen), Charles Heinig (sued as Heine), Andrew Emerson, Fred Wagner, A. Mashek and Lee S. Fisher, are defendants to the bill, and all the appellants, except Fisher and John Brent, admit knowledge of the injunction, and the last mentioned two do not deny such knowledge, nor do their counsel, although such knowledge is averred in the petitions to which they are respondents; and they having been prominent in the strike and its prosecution, as admitted by their counsel, and the greatest possible publicity of the injunction being shown by the evidence, it is next to impossible that they were ignorant of it.

Counsel object that the bill is insufficient on which to base an injunction. Christensen v. Kellogg Switchboard & Supply Co., 110 Ill. App. 61, was an appeal from the order granting the injunction, and appears to have been thoroughly considered. The court in that case considered the sufficiency of the bill to warrant an injunction, and held it sufficient and the injunction valid. All questions decided in that case, and also all questions which might have been decided, if properly presented, are *res adjudicata* as to all parties to the bill. As to appellants not parties to the bill, we perceive no good reason for dissenting from the opinion that the bill is sufficient and the injunction valid. On the contrary, we concur in the decision.

It is also contended that the informations on which the several contempt proceedings were based are and each of them is insufficient, in not more particularly alleging facts, and counsel urge that these objections go to the jurisdiction of the court. The court had jurisdiction of the persons of the defendants to the bill, and of the subject-matter of the bill, and had power to issue an injunction, and, in proceedings for contempt, in violating the injunction, no defense can be made on the ground of irregularity, or that there was error in the proceedings. Dickey v. Reed, 78 Ill. 261, 279; Leopold v. The People, 140 Ill. 552, 557; People v. Weigley, 155 Ill. 491, 501; Clark v. Burke, 163 Ill. 334, 337. In Dickey v. Reed, the court say : " Where the court has

power over the subject-matter, and authority to take such jurisdiction, and the court acts, its process must be obeyed," etc.   In Leopold v. The People, the court say:  "If the court has jurisdiction of the parties and legal authority to enter the order, then a party cannot stand in defiance of it, however improvidently or erroneously made."  In Clark v. Burke, the court say :  " It is well settled that in a proceeding for contempt, in failing to obey an order of the court, the respondent may question the order which he is charged with refusing to obey only in so far as he can show it to be absolutely void, and cannot be heard to say that it is merely erroneous, however flagrantly it may appear to be so." See, also, Glay v. The People, 94 Ill. App. 598, 600, and *Ex parte* Richards, 117 Fed. R., p. 668.

In the present case we think the petitions amply sufficient; that it is not necessary that one shall be a party to the bill, or officially served with the writ, in order for him to be bound by the injunction, but only that he shall have actual notice of it; see High on Injunctions, 3rd ed., sec. 17, and *Ex parte* Richards, 117 Fed. R. 658, 662, and cases cited. It is contended that the contempts are criminal, and therefore appellants should have been discharged on their answers.   The relief sought is a permanent injunction, and preliminary thereto a temporary one of the same character as the permanent one prayed.   Manifestly, the preliminary injunction is for the benefit of complainant, and therefore its enforcement is for its benefit.

As counsel for appellants say in their argument in Hopkins v. The People, general number 12,275, which is error to reverse two of the judgments in question, " An injunction without contempt proceedings would be of no value;" which is true on the hypothesis that the persons enjoined should seek to violate the injunction.   The injunction and its enforcement being for the complainant's benefit, the proceedings must be regarded as civil.   We regard the case of Loven v. The People, 158 Ill. 159, as conclusive of the question.   In that case Loven, a former employee of the complainant in the bill, had learned, while in complainant's

employ, about certain medicines known by certain names, which the complainant had the exclusive right to manufacture and sell under those names, and was fraudulently selling medicines under the names of complainant's medicines, and practically stealing the complainant's business. A permanent injunction was granted, enjoining Loven in the premises. Subsequently, contempt proceedings were instituted against Loven, and the court adjudged him guilty and that he be committed to jail for ten days. It was urged, on appeal, that Loven should be discharged on his answer, but the court held the contrary, saying: "There is a well-recognized distinction between the practice in contempts, properly so-called, when the proceeding is to vindicate the majesty of the law, or the dignity of the court, and cases involving acts treated as contempts, for the enforcements of orders and decrees," etc. See, also, Barclay v. Barclay, 184 Ill. 471, 475, and cases cited; Rapalje on Contempt, sec. 21; People v. Court of O. & T., 101 N. Y. 245; Thompson v. Penn. R. R. Co., 48 N. J. Eq. 105; and Clark v. Burke, 163 Ill. 334.

Appellants' counsel object to the overruling by the court of motions for bills of particulars, and to a hearing on affidavits, instead of calling witnesses and examining them in open court. It was clearly a matter within the discretion of the court as to whether or not a bill of particulars should be ordered. This is true even in indictments for conspiracy. 1 Bishop on Crim. Procedure, section 643. We are also of opinion that bills of particulars were unnecessary to enable appellants to prepare their defense, as the affidavits setting forth the facts are made a part of the informations, respectively. It is not the practice to furnish bills of particulars in contempt cases. In Loven v. The People, supra, the information charging contempt was heard on affidavits, and whether such information shall be so heard is a matter within the court's discretion.

It is admitted in the answers of appellants Christensen, Doty, Heinig, Emerson, Wagner and Mashek, to the petition filed June 3, 1903, and the supplemental petition filed

June 5, 1903, in substance, that they were picketing complainant's place of business, and interfering with its employees and with persons seeking employment with it, notifying them of the strike and persuading the former to leave its employ and the latter not to enter it, and that each of them occupied a position near to said place of business for the purpose of so doing.   The evidence is that a number of other persons were engaged as the above named appellants were, after the issuing of the injunction and prior to June 3, 1903.   It is shown by affidavits that a number of complainant's employees were stopped by pickets on their way to complainant's factory; that one of said employees, when on his way to work, was stopped by Christensen, who took hold of and would not let him go, and told him that if he continued to work he would have to pay a $50 fine to the union, and, on another occasion, told him that if he continued to work it would not be healthy for him; that a person who had accepted work at complainant's factory was, on leaving the factory, accosted by four pickets, who asked him what he intended doing at Kellogg's, and if he didn't know there was a strike there, and, upon his stating that he was going to work the next morning, they said to him, " We will see that you don't go to work tomorrow morning." One of complainant's employees on his way home from work was stopped by two of its former employees, who were strikers, and had been picketing and patrolling, and was asked if he was working at Kellogg's, and when he answered affirmatively, they said, " Why don't you go out on a strike with the rest of us ?  We'll give you till Friday to get out of there; " and when he said he was satisfied with his wages, they said,  " We're going to win this strike, and when we get back there we'll make things hot for you scabs.  You won't be able to work there."  Another employee was stopped by four pickets, one of whom said to him,  " Are you working over at Kellogg's ?  If you are you had better look out."  Another, on being stopped by pickets and told there was a strike at Kellogg's, said he didn't care, when one of them said to him, " You don't care ?  Well, suppose

we make you care?" Another employee, on his way home
from work, was accosted, stopped and remonstrated with
for working for complainant, by a person whose name was
unknown to him but whom he saw the next day on a street
corner near complainant's place of business, in company
with pickets, and when the employee declined to talk further
the unknown person knocked him down and kicked him
twice. Another employee was stopped by pickets, one of
whom, on being informed that he was working for com-
plainant, said to him: "Don't you dare to come to work
tomorrow. If you do, we'll blow your brains out;" and an-
other of the pickets said to him, "There'll be trouble if you
keep on working there." Other similar incidents occurred.

Appellants O'Brien and Queenan, in their answers to the
petition filed June 22, 1903, admit picketing and persuad-
ing complainant's employees to quit its employment and
those seeking employment with it to desist therefrom, and
claim they had legal right so to do. and that they had acted
under the advice contained in the letter of Clarence S. Dar-
row copied in the preceding "Statement of the Case." June
12, 1903, the date of the Darrow letter, the court passed on
the question of the guilt of the respondents to the petition
and supplemental petition filed June 3 and 5, 1903, and dis-
tinctly stated that picketing of the character shown by the
evidence was unlawful, and would not be permitted. Mr.
Darrow, in his letter, instructed that the pickets should
not exceed ten in number, apparently implying, as we think,
that pickets in excess of that number could not act with
impunity.

The affidavits in support of the petition of June 22 do
not purport to state all the pickets on duty between June
5, when the supplemental petition was filed, and June 22,
when the second petition was filed, but do name twenty
men and eleven women acting as pickets between those
dates. The affidavits show that, between the dates men-
tioned, O'Brien picketed and patrolled in the immediate
neighborhood of complainant's place of business on the 8th,
9th, 10th, 11th, 12th, 13th, 16th, 17th and 18th days of

June, 1903, and that Queenan did likewise for seven days, commencing June 4, and ending June 15, 1903. It appears also from the affidavits in support of the petition of June 22, that the same system of picketing, patrolling and interfering with employees of the complainant and those seeking employment with it, were continued, and that the conditions were worse after than before June 22. The following is shown by affidavits:

On the evening of June 18, 1903, Mamie Whalen, an employee of complainant, when returning home from work in company with five other girls, also in complainant's employ, passed on Congress street, half way between Aberdeen street and Center avenue, twelve or fifteen men and boys, one of whom ran up to John Radcliffe, watchman of complainant, who accompanied the girls for the purpose of protecting them, and asked Radcliffe if he was protecting the girls, and on being told he was, struck him, knocked him down and brutally kicked him, and another of the men was about to strike him with a club, when one of the girls grabbed him by the arm and prevented him. Also that the girls returned to the factory with Radcliffe, and when about four blocks from there, one McDonough and another person were walking in front of them, when appellant Emerson and another person, both of whom had been in the employ of complainant and had been picketing and patrolling round its place of business, ran up and struck and knocked down McDonough, and some teamsters who were driving along jumped from their wagons and commenced kicking him. On McDonough inquiring why they were hitting him, Emerson said, "You are protecting those girls;" when the girls said, "No, he isn't, we have nothing to do with him;" and they then permitted him to get up, when he exhibited his card, showing that he was employed at the public library. Emerson then began to apologize and told McDonough he was mistaken, when McDonough declined to accept any apology, and Emerson again knocked him down. Emerson was one of those fined $10 on the first petition. On June 19, 1903, Ed Behlendorf, employee

of complainant, on returning home from his work in company with Griswold, another employee, was met by some person unknown to the affiants, who struck Behlendorf in the face and knocked him down senseless, and then signalled three other men, who ran over while he was lying on the ground, one of whom struck Griswold, who then ran away to call the police.

Thomas Queenan is the business agent of the Electrical Workers' Union. At the east door of the factory he spoke to one Hall and tried to persuade him to quit working for complainant, and said to him, " Do you not know they have got to come to terms with us?" and Hall answered, "No, I do not know that," when appellant Queenan said, "Well, you should know."

An employee of complainant was stopped by appellant John O'Brien as the former was going to his lunch at the noon hour, when O'Brien said to him, " You boys ought to stay out and join the union. You want to try and get the other fellows out and join the union also." When the employee said he was satisfied with his work and did not want to quit, O'Brien responded, " If you do not come out by night, I will lick you."

It is practically impossible, without extending this opinion beyond all reasonable bounds, to refer to all of the affidavits in support of the petition of June 22. They are very numerous and it clearly appears from them that a large number of the former employees of complainant picketed and patrolled in the immediate neighborhood of complainant's factory, and in the approaches thereto, and endeavored, sometimes by warnings, sometimes by threats, and, in a number of times, by actual assault and beatings and the use of opprobrious epithets, to deter complainant's employees from remaining in its employ, and to prevent others seeking employment with it from entering its employ, by means of which constant fear of bodily injury was engendered in the minds of such persons.

The appellants deny that they personally used force, threats or intimidation of any sort, and say that they were

very peaceable and mildly persuasive. But the very presence of a large number of pickets, with the avowed purpose of preventing complainant's employees from remaining in its employ, and those seeking employment with it to desist therefrom, was itself intimidation. In Farmers' Loan & Trust Co. v. N. Pac. R. R. Co., 60 Fed. R. 803, 820, Mr. Justice Jenkins quotes the following remarks of Mr. Justice Brewer on the subject: "The common rule as to strikes is this: Not merely do the employees quit the employment, and thus handicap the employer in the use of his property, and perhaps in the discharge of duties which he owes to the public, but they also forcibly prevent others from taking their places. It is useless to say that they only advise; no man is misled. When a thousand laborers gather around a railroad track and say to those who seek employment that they had better not, and when that advice is supplemented every little while by a terrible assault on one who disregards it, every one knows that something more than advice is intended. It is coercion—force; it is the effort of the many, by the mere weight of numbers, to compel the one to do their bidding."

In Union Pac. Ry. Co. v. Ruef, 120 Fed. R. 102, the court say, ib. 107: "The mere fact that the shops are picketed can only be intended for intimidation. The fact that a line of pickets is immediately in front of the shops, or a few blocks away, is a difference in degree only." The court then quotes with approval the following from American Steel & Wire Co. v. Wire Drawers' and Die Makers' Union, 90 Fed. R. 608, 614: "The whole fallacy of the defense against this bill and the proof offered to sustain it lies in a convenient misapprehension or a necessary misunderstanding of the character of that force or violence which all agree is not permitted in the conduct of a strike. It seems to be the idea of the defendants that it consists entirely of physical battery and assaults, and that if these appear in the proof, and they can be justified as they might be on a criminal indictment or in a police court, that ends the objection, and the justified assaults and batteries will not sup-

port an injunction. The truth is that the most potential and unlawful force or violence may exist without lifting a finger against any man, or uttering a word of threat against him. The very plan of campaign adopted here was the most substantial exhibition of force, by always keeping near the mill large bodies of men, massed and controlled by the leaders, so as to be used for obstruction if required. A willing wire worker, but a timid man, would be deterred by the mere knowledge of that fact from going to the mill when he desired to go, or had agreed to go, or, being already at work, feared to return through the streets where the men were congregated, or, having started, would turn back, fearing the trouble that might come of the attempt. Such a force would be violence, within the prohibition of the law ; and its exhibition should be enjoined, as violating the property rights of the plaintiffs in the streets, their liberty of contracting for substituted labor, and the liberty of the substitutes to work if they wished to accept the lowered wages, and to pass through the streets to their work." See, also, the following cases : *Ex parte* Richards, 117 Fed. R., p. 666–7, and cases cited; O'Neil v. Behanna, 182 Penn. St., 236, 243, in which the court say : " The strikers and their counsel seem to think that the former could do anything to attain their ends, short of actual physical violence. This is a most serious misconception. The 'arguments' and 'persuasion' and 'appeals' of a hostile and demonstrative mob have a potency over men of ordinary nerve which far exceeds the limits of lawfulness. The display of force though none is actually used is intimidation, and as much unlawful as violence itself."

The affidavits in support of the petition filed July 14, 1903, show that on divers days between June 22, when the second petition was filed, and July 14, 1903, appellants Fisher, Christensen, Evans, Mashek and Brent picketed and patrolled around and about complainant's place of business, watching the streets, alleys and approaches thereto, daily shifting their positions; that they so stationed themselves that all complainant's employees were obliged to pass

Christensen, et al., v. The People.

through their picket line, and that their attitude was ugly and menacing, and such as to cause fear in the mind of an ordinary person, and that John O'Brien picketed and patrolled in a similar way June 19 and 20, 1903. The conditions between the dates last mentioned were worse than before. Complainant's employees and persons seeking employment with it were waylaid on their way to and from the factory, insulted, threatened, and, in numerous instances, assaulted and beaten by the strikers, pickets and patrollers, and complainant's business was seriously and injuriously interrupted. June 30, 1903, when a number of men and girls, employees of complainant, were being escorted from the factory to their homes, they were met by a number of men and boys and a very serious riot occurred. The employees were hissed and called scabs; bricks and stones were thrown at those escorting them, and some shooting occurred. Four of the girls deposed that appellant John O'Brien passed them on that occasion, and called them scabs and other names in a threatening way. Finally, there occurred what is called a sympathetic strike, by the Teamsters' Union, which it is reasonable to infer occurred by the request of officers of unions whose members had quit complainant's employ and were "prosecuting" the strike. Before this sympathetic strike, complainant's teaming and hauling had been done by the Arrow Transfer Company, and that company could not, by reason of the sympathetic strike, fulfill its teaming contract with complainant, because the teamsters in its employ would not be permitted to haul for complainant. The result was that June 24, 1903, all teaming and hauling of merchandise to and from complainant's factory were stopped.

O'Brien, in his answer, says he was fined July 2, 1903, which was under the rule to show cause entered on the petition filed June 22, 1903. He says that, since July 2, 1903, he has not in any way participated in the strike. The court, on the petition filed June 22, could only investigate his conduct prior to that date, and in his answer he gives no account of himself in the interval between June 22 and July 2, except denying participation in the riot of June 30.

The purpose of the strike by complainant's employees, and their prosecution of it as described, was to compel the complainant to execute the agreements referred to and made a part of the bill. The drafts of agreements, three in number, purport to be with the different unions, whose members were in complainant's employ. The draft of agreement with the Metal Polishers, Buffers, Platers, Brass Moulders and Brass Workers, International Union of N. A., International Union of Steam Engineers and International Brotherhood of Stationary Firemen, contains the following :

"Article I. The party of the first part hereby agrees to employ none but members of the aforesaid organizations or those who carry the regular working card of the said organizations, provided the various crafts will furnish such competent help as may be required by the party of the first part within twenty-four hours after notification.

Article VII. There shall be a steward for each craft in each factory appointed by the organization, whose duty it shall be to see that the men working in said factory belong to the organizations.

Article VIII. It is hereby agreed by the party of the first part that the business agent of the party of the second part shall have the privilege of interviewing any member of the party of the second part in the offices of the party of the first part during business hours.

Article X. A sympathetic strike to protect union principles shall not be considered a violation of this agreement.

Article XI. All the apprentices shall belong to the union and carry the working card of the organization.

Article XII. The number of apprentices not to exceed one for ten men or less of the different crafts."

That the purpose of the strike was to compel the execution of the drafts of agreement is clear. It is averred in the sworn bill and deposed to in the affidavits of DeWolf, complainant's president, Kellogg, its secretary and treasurer, and Edwards, its superintendent, that business agents of the different unions called on complainant, and insisted on its executing the agreements, and that, when complainant's president refused, on the ground that the proposed agreements were unreasonable, it was threatened by one of

said business agents that unless complainant would sign the agreements a strike would be called, and that said business agents called a strike, in response to which about 500 of complainant's employees quit its employ. Appellants' counsel admit in their brief, "the purpose of the strike is to bring about the execution of the contracts," and at least three of appellants so admit in their answers. It is unlawful to compel one to execute any contract. A contract executed under duress is voidable, and duress is present where a party "is constrained, under circumstances which deprive him of the exercise of free will, to agree to or to perform the act sought to be avoided." 10 Am. & Eng. Ency., 2nd ed., p. 321. "Duress *per minas* exists when a person is induced to perform an act to avoid a threatened and impending calamity." Ib. 324. Especially was the purpose to compel complainant to execute the agreements in question an unlawful purpose. Article I strikes at the right of contract, and provides that complainant shall employ none but members of the several unions, thus discriminating in favor of one class of men and excluding all others. In Matthews v. The People, 202 Ill. 389, the court, discussing the constitutionality of the Free Employment Agency Act, say, p. 401 : "An employer whose workmen have left him and gone upon a strike, particularly when they have done so without any justifiable cause, is entitled to contract with other laborers or workmen to fill the places of those who have left him. Any workman seeking work has a right to make a contract with such an employer to work for him in the place of any one of the men who have left him to go out upon a strike. Therefore, the prohibition contained in section 8 strikes at the right of contract, both on the part of the laborer and of the employer. It is now well settled that the privilege of contracting is both a liberty and a property right. Liberty includes the right to make and enforce contracts; because the right to make and enforce contracts is included in the right to acquire property. Labor is property. To deprive the laborer and the employer of this right to contract with one another is to violate sec-

tion 2 of article 2 of the constitution of Illinois, which provides that 'no person shall be deprived of life, liberty or property without due process of law.' It is equally a violation of the fifth and fourteenth amendments of the constitution of the United States, which provide that no person shall be deprived of life, liberty or property without due process of law, and that no state shall deprive any person of life, liberty or property without due process of law, 'nor deny to any person within its jurisdiction the equal protection of the law.' Ritchie v. People, 155 Ill. 98; Adams v. Brenan, 177 Ill. 194; Gillespie v. People, 188 Ill. 176; Fiske v. People, 188 Ill. 206. The provision embodied in section 8 'is a discrimination between different classes of citizens founded on no justifiable ground, and an attempt to exercise legislative power in behalf of certain classes and against other classes, whether laborers seeking work or employers. It falls under the condemnation of the constitution.'" In Am. Steel & Wire Co. v. Wire Drawers', etc., Unions, 90 Fed. Rep. 608, 613, the court say: "In this country the right to contract in business is a constitutional freedom, which not even state legislatures can impair, and, certainly, not strike organizations; for, surely, they cannot lawfully do what the legislature may not."

The agreements in question would, if executed, tend to create a monopoly in favor of the members of the different unions, to the exclusion of workmen not members of such unions, and are, in this respect, unlawful. Contracts tending to create a monopoly are void. Morris Run Coal Co. v. Barclay Coal Co., 68 Penn. St. 173, pp. 186–188; Arnot, Jr., v. Pittston, etc., Coal Co., 68 N. Y. 558; Central O. Salt Co. v. Guthrie, 35 O. St. 666. The legislature of the state cannot create a monopoly. People ex rel. v. Chicago Gas Trust Co., 130 Ill. 268, 296–7.

The purpose of the strikers is in violation of the criminal code, which provides as follows:

"Sec. 158. If any two or more persons shall combine for the purpose of depriving the owner or possessor of property of its lawful use and management, or of preventing, by threats, suggestions of danger, or any unlawful means,

any person from being employed by or obtaining employment from any such owner or possessor of property, on such terms as the parties concerned may agree upon, such persons so offending shall be fined not exceeding $500, or confined in the county jail not exceeding six months."

"Sec. 159.   If any person shall, by threat, intimidation or unlawful interference, seek to prevent any other person from working or from obtaining work at any lawful business, on any terms that he may see fit, such person so offending shall be fined not exceeding $200."   1 Starr & Curtis, pages 1313, 1314.

Not only was the purpose of the strike unlawful, but the means used to achieve the unlawful purpose were unlawful. The means used were the acts heretofore mentioned, and thereby injury to the complainant's business. The appellants and their associates intended to stop the business of the complainant so far as they possibly could, and the evidence shows that they did stop it in great part, to complainant's injury. The following is contained in the brief of appellants' counsel, which we quote as illustrative of their view of the cause: "How do picketing, patrolling, persuading, or even slugging, affect property rights, except in the most fantastic sense? Injury to business has no independent existence whatever, because business has no tangible existence to be injured, in the true and unperverted sense."

In Union Pac. Ry. Co. v. Ruef, 120 Fed. R. 102, 113, cited by counsel for appellants, the court say: " And that one's business is his or its property is likewise elementary, and is conceded by all. And that liberty means the right to do as he pleases, when he interferes with the rights of no other person, and the right to make contracts with all persons upon all subjects-matter, save and excepting with reference to immoral or unlawful matters, is also conceded by all who know anything of the propositions." See, also, Doremus v. Hennessey, 106 Ill. 608, 615, in which the court say: "Every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor and capital according to his own will, and any one who invades that right, without lawful

cause or justification, commits a legal wrong;" also Am. Steel and Wire Co. v. Wire Drawers', etc., Unions, cited *supra;* and Barr v. Essex Trades Council, 53 N. J. Eq. 101, and Thomas v. Cinn., etc., Ry. Co., 62 Fed. 803, 817. In the New Jersey case, p. 112, the court says, "A man's business is his property." The court further say, p. 113–114: "The freedom of business action lies at the foundation of all commercial and industrial enterprises; men are willing to embark capital, time and experience therein, because they can confidently assume that they will be able to control their affairs according to their own ideas, when the same are not in conflict with law. If this privilege is denied them, if the courts cannot protect them from interference by those who are not interested with them, if the management of business is to be taken from the owner and assumed by, it may be, irresponsible strangers, then we will have come to the time when capital will seek other than industrial channels for investments, when enterprise and development will be crippled, when interstate railroads, canals and means of transportation will become dependent on the paternalism of the national government, and the factory and the workshop subject to the uncertain chances of cooperative systems." The case is instructive as to the law in relation to a combination to injure one's business. Other authorities might be cited, but we know of no well-considered case, or indeed of any case, holding that a combination of persons to injure the business of another is not unlawful. That the appellants, and others associated with them, acted in concert, in unlawfully endeavoring to injure, and in fact injuring complainant's business, for an unlawful purpose, is fully sustained by the evidence. They conspired, breathed together, to effect the unlawful purpose, and by overt acts did all they possibly could to that end. It is not necessary to prove an express agreement between the appellants and those associated with them. It may be proved by circumstantial evidence. Spies et al. v. The People, 122 Ill. 1, 213; Patnode v. Westenhaver, 114 Wis. 460. In United States v. Weber,

Christensen, et al., v. The People.

114 Fed. R. 950, 953, the court say: "But if the object of the union is illegal, or if the methods employed by it, either to induce acquisitions to its ranks, or to accomplish its ulterior purposes, are illegal, it appears to be well settled that the persons who combine in such efforts are conspirators," citing cases. The language quoted is cited with approval in *Ex parte* Richards, 117 Fed. R. 658, 668. In Doremus v. Hennessy, 176 Ill. 608, 614, the court say: "No persons, individually or by combination, have the right to, directly or indirectly, interfere with or disturb another in his lawful business or occupation, or to threaten to do so, for the sake of compelling him to do some act which, in his judgment, his own interest does not require."

Each conspirator is responsible for the acts and declarations of every other conspirator in furtherance of the common purpose. In Hamilton v. Smith, 39 Mich. 222, 231, cited with approval in Lasher v. Littell, 202 Ill. 551, the court say: "Wherever two or more conspire together to commit an actionable wrong, everything said, done, or written, by any one of them, in the execution or furtherance of their common purpose, is deemed to be said, done or written by every one, and is a relevant fact as to each." This proposition is so thoroughly established that it may be regarded as elementary. Cooley on Torts, 2nd ed., p. 145; Spies v. The People, 122 Ill. p. 226; Patnode v. Westenhaver, 114 Wis. 460, 474. In reference to the conduct of appellants, their counsel, in their printed argument, admit: "The appellants in this court were prominent in the calling and in the prosecution of the said strike, and after they and their co-employees had left the service of the Kellogg Switchboard & Supply Company they went into the streets at different distances from the place of business of the Kellogg Switchboard & Supply Company and took positions where they could meet any one who happened to be on his way for the purpose of taking employment with the Kellogg Switchboard & Supply Company. These men have been denominated pickets by the prosecution. It matters

not what word is used to designate the office that they were performing in the prosecution of the strike, any more than some words have a tendency to affect the public imagination more than others. But while these men were standing in the streets—300, 400 or 500 feet from the place of business of the Kellogg Switchboard & Supply Company, they were unquestionably endeavoring to induce all persons having in mind the taking of service with the complainant, not to do so. They were distributing printed cards which were offered in evidence as exhibit A, and is in the words and figures as follows : ' Machinists who may be seeking employment at the Kellogg Company, know that the former employees have ceased work; therefore, by accepting a position, you are taking a fellow workman's place.' " The cards actually distributed were as follows : " Machinists who may be seeking employment at the Kellogg Switchboard & Supply Co. To know that the men formerly employed there have ceased work, to secure union conditions to govern their employment. Therefore, by accepting a position in their plant, at the present time, you are taking a fellow workman's position, and their position has been endorsed by the International Association of Machinists. Be guided accordingly."

The conspiracy originated simultaneously with the calling of the strike, and continued till the filing of the last petition, July 14, 1903. It was a single conspiracy, and the court on the hearing of each of the second and third petitions, did not err in hearing the prior evidence. The evidence was competent as tracing and showing the character of the conspiracy. State v. McCahill, 72 Ia. 111, 115.

It is an indispensable condition of the enjoyment by each citizen of the liberty and rights guaranteed by the constitution and laws, that he shall respect and not unlawfully infringe upon the liberty or rights of any other citizen. This cannot be done with impunity.

In Mashek v. The People, Gen. No. 11416, Mashek was sentenced to be committed to the county jail for sixty days, while Christensen was sentenced to be so committed for

only thirty days. We cannot find in the evidence any reason for this discrimination. Mashek is not shown to have been more guilty than Christensen. On the contrary, we think if there was any difference in the guilt of the two, Mashek was the less guilty. The judgment, therefore, in Mashek v. The People, Gen. No. 11416, will be reversed and judgment will be entered here that Mashek be committed to the county jail, there to remain for thirty days, unless sooner legally discharged. In each of the other above entitled appeals, the judgment will be affirmed.