# Piano & Organ Workers' International Union of America v. The Piano & Organ Supply Company.

## Gen. No. 12,070.

1. INJUNCTION—*when bill for, to restrain intimidation by pickets, etc., sufficient.* The bill in this case held sufficient to sustain the granting of an interlocutory injunction restraining acts of intimidation and violence by pickets.

2. INJUNCTION—*who proper parties to.* A labor union, together with its officers, who advised, counseled and supported the other defendants, and who participated in their acts, is a proper party to a strike injunctional order.

3. INJUNCTION—*what sufficient ground for inclusion of particular party in.* A court need not wait until an overt act has been committed before including a particular party in a strike injunction order; if there is a reasonable fear that a particular party will participate in the unlawful action or actions enjoined against, a suffi-

23

cient ground exists for the inclusion of such party in the injunction.

4. STRIKE INJUNCTION—*right of court to make permanent after termination of strike.* An interlocutory strike injunctional order may within the discretion of the court be made permanent notwithstanding the difficulties out of which it grew have ceased.

5. STRIKE—*when lawful, when not.* To strike for any cause or for no cause is not unlawful, but to issue a strike order for the purpose of establishing a boycott upon some person's goods, with the intent thereby to injure the business of such person, is unlawful.

Injunctional proceeding. Appeal from the Superior Court of Cook County; the Hon JESSE HOLDOM, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed January 18, 1906.

**Statement by the Court.** This is an appeal by the Piano & Organ Workers' International Union of America alone from a decree rendered by the Superior Court June 28, 1904, against it and fifty-four other persons, some natural and some artificial.

The gist of the decree was a perpetual injunction against certain acts alleged in a bill of the appellee, The Piano & Organ Supply Company, to be threatened and in process of execution by the defendants. The perpetual injunction followed an interlocutory one of the same purport against the same defendants, which seemed during its pendency to have accomplished the purpose sought and brought to an end the acts complained of by appellee, among whose employees at the time of the issuance of the interlocutory injunction, a strike and "labor troubles" existed.

The enjoining words of the decree appealed from (as they were of the interlocutory order) are: "they" (i. e. all the defendants) "are hereby enjoined absolutely and perpetually from conspiring together unlawfully to prevent said complainant from peaceably and quietly carrying on its business, and from in any manner interfering with, hindering, obstructing or stopping any of the business of said complainant; and from attempting to compel, directly or indirectly, by threats, intimidation, force or violence, violent or abusive language, or any persuasion that is not peaceable, any ·of the employees of said complainant, to refuse or fail to perform

their duties as such employees; and from compelling or inducing, or attempting to compel or induce, by threats, intimidation, force, violence, violent or abusive language, any of the employees of said complainant to cease and abstain from the service of said complainant, and from attempting to keep from the service of complainant any person or persons, by threats, intimidation, force, violence, violent or abusive language; or from preventing or attempting to prevent any person or persons, by threats, intimidation, force, violence, violent or abusive language, from entering upon the service of said complainant; and from congregating at or near the premises of said complainant; or on the streets near and leading thereto, for the purpose of inducing, by threats, either in manner or by words or by violence, or compelling by threats, intimidation, violence, violent or abusive language, the employees of said complainant to fail to perform their services to said complainant as such, or for the purpose of preventing persons desiring so to do from entering upon the service of said complainant; and from congregating at or near the place of work of said complainant's employees, or elsewhere, for the purpose of intimidating or coercing them, by threats, violence, abusive or violent language, or for the purpose of preventing them from reaching complainant's place of work, or to return therefrom to their respective houses or boarding places; and from in any manner interfering with or molesting, either by threats, intimidation, violence, abusive or violent language, any of complainant's employees in going to and from said complainant's works; and from going singly or collectively to the homes or boarding houses or places of residence of said complainant's employees, or any of them, for the purpose of intimidating or coercing any or all of them to leave the employ of complainant, and from carrying out or attempting to carry out any agreement among themselves or any of them, or any combination and agreement with others having for its purpose the accomplishment of any unlawful acts or things hereby prohibited; and from preventing said complainant from delivering its manufacturing product and other materials

and supplies from its factory, or from preventing any person or persons from delivering to said complainant's factory any supplies or other articles which it may desire to have delivered to its factory, by threats, intimidation, force or violence, and from establishing or maintaining pickets for the purpose of hindering or preventing, by threats, intimidation or violence, in any way, the employees of said complainant and persons seeking its employ, from going into the factory or lumber yard of said complainant; and from preventing or attempting to prevent, by threats of boycott or strike any person or persons from dealing with said complainant, or completing any contracts with said complainant, or from purchasing or receiving goods manufactured by said complainant, or from calling out a strike in any plant or factory owned or operated by any other person, because of the fact that such person may purchase supplies or products from said complainant, or sell supplies or materials to said complainant, or by reason of the fact that said person or persons may use in their factory any material manufactured by said complainant, or coming from the plant of said complainant."

All the defendants prayed and were allowed an appeal, but the appellant alone perfected one.

The appellant has argued in this court, under an adequate assignment of errors for that purpose, that the injunction should not have been made permanent, because whatever were the acts injurious to the complainant's property rights, threatened or in process of transaction when the interlocutory injunction was granted, they were all either finished or altogether abandoned and no longer threatened when the final decree was entered, and that as against the appellant there was no evidence to support the decree or any part of it, and no jurisdiction to make it, even if there were such evidence, and that as to all the defendants, certain parts of the injunction were arbitrary and unwarranted by the law and the facts.

JOHN A. BLOOMINGSTON, for appellant.

SCOTT, BANCROFT, LORD & STEPHENS, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

The bill in this cause makes the allegations usual in bills on which injunctions of this nature are sought. Stating the business of the complainant to be the manufacture and sale of piano keys and actions, organ keys, reeds and boards, and its location to be in Chicago, the bill goes on to allege that there is a sum not less than $300,000 invested in the plant, and that it had, prior to the actions of the defendant complained of, 425 to 475 men in its employment. It then alleges that there is in existence in the city of Chicago a voluntary organization known as the Piano & Organ Workers' International Union, which is a delegate body made up of delegates or representatives of local unions located all over the United States, and that one of said local unions in Chicago is a voluntary association known as the Piano & Organ Workers' Local Union No. 1, composed of working men and artisans who are engaged in any way in the manufacture of pianos and organs in factories in Chicago other than the factory of the complainant; that September 1, 1903, the most of the employees of the complainant in various rooms quit work—"went on a strike," the number of the strikers altogether being about 130; that as a result the complainant was compelled to close down the factory on the evening of September 1st, and did not attempt to resume operations until September 10, 1903; that after it closed down its factory on September 1, 1903, the complainant conferred with about 260 of its employees; that nearly all of them said they were ready to return to work, and complainant announced that it would resume operation of its factory September 10, 1903; that between September 1 and September 10, 1903, a new local union of the Piano & Organ Workers' International Union of America was organized by one Charles Dold, the general organizer of said International Union, and by striking employees of complainant, to be known as Piano & Organ Workers' Local Union No. 50, and that thereupon the said local union 50 and officers and representatives of local union

No. 1, "took the management of said strike at complainant's factory" and installed "pickets" around the premises, consisting of former employees of the complainant, and other members of the unions; that from September 10, 1903, the day that complainant resumed operation, to the day of the filing of the bill (September 25, 1903) said pickets have, for the greater part of the time each day, marched up and down in front and around the factory, and have "accosted" every employee "who attempted to return to work and all men seeking employment at the factory with lowering looks, fierce demeanor, threatening gesture, verbal threats of bodily injury and death, and opprobrious epithets," and in many cases accompanied the threats with acts of violence; that sometimes there were seventy or eighty pickets on the streets leading to the factory, and every one of the employees who entered the factory was obliged to pass through the crowd of pickets; that in consequence many employees were afraid to resume work, and other workmen desiring to work there have been intimidated therefrom; that everybody leaving the factory was threatened with bodily violence and injury in case they continued in the employ of complainant; that these threats, threatening looks, opprobrious epithets and acts of violence constitute a breach of the peace, and a menace to the safety of complainant's employees, and a violation of the property rights of the complainant, and have caused the complainant to lose the services of employees and prevented it from filling their places; that in order to retain any considerable number of men, the complainant was obliged to keep said men within its factory and feed and lodge them, at a great expense; that upon its doing so, the hostile, threatening and warlike picketing was kept up by night as well as day.

The bill also sets up various specific instances of threats and of violence of the character theretofore indicated, and also alleges that the "pickets" placed by the defendants have interfered with the arrival of supplies to use in the factory, and supplies of food to the men who have been boarded by the complainant, and have interfered with the departure of the manufactured product of the complainant.

The bill further alleges that Piano & Organ Workers' Local Union No. 1, at a meeting held on or about September 11, 1902, adopted a resolution that all members of said Union No. 1 employed in factories using complainant's product should refuse to handle or work upon any material supplied by the complainant to its customers, and caused notice of this resolution to be mailed, on or about September 14, 1903, to piano and organ manufacturers in Chicago who were customers of complainant, and to be published in the September, 1903, issue of the Piano & Organ Workers' Official Journal, published by and under the direction of and as the official organ of the Piano & Organ Workers' International Union of America.

That these allegations, supported by proof, justified the chancellor in granting the interlocutory injunction, cannot be doubted in view of the rules which have been laid down by the Supreme Court and this court in previous cases.   Doremus v. Hennessy, 176 Ill., 608; Matthews v. People, 202 Ill., 389; O'Brien v. The People, 216 Ill., 354; Christensen v. Kellogg Switch Board Supply Co., 110 Ill. App., 61; Christensen v. People, 114 Ill. App., 40.

The alleged acts of intimidation and violence by the so-called "pickets," which interfered with the business and property rights of the complainant, were of course unlawful and properly to be forbidden.    The action of the Local Union No. 1, in attempting to establish a boycott of the complainant's goods, and thus injure its business, until certain wishes and demands of the union were complied with, whatever may be the diverse opinions concerning the ethical character of such weapons in a controversy between employers and employed, or their legal character at common law, is, we think, expressly made unlawful in Illinois by the "act to amend Section 46 of Division One of the Criminal Code," passed June 16, 1887.    Neither interlocutory nor permanent injunction goes farther than forbidding these unlawful actions.

The chancellor, in his decree making the injunction permanent, found that the evidence sustained the allegations of

the bill, and our examination of the record convinces us that this finding was correct.

The only questions, therefore, remaining seem to be, first, whether a permanent injunction ought to have been granted after it appeared in evidence that during the pendency of the interlocutory injunction and before the final hearing, December 22, 1903, the strike and all the trouble between the complainant and the persons, natural and artificial, defendant to the bill, was ended; and, secondly, whether the appellant, the Piano & Organ Workers' International Union of America, was so far concerned or implicated in the unlawful interference with complainant's property rights, and so far within the jurisdiction of the court as to make it a proper party to the injunction.

Whatever argument may be urged concerning the necessity or expediency of making such an injunction as this permanent after the troubles which called it out in its interlocutory form, and which are the substance of the allegations of the bill on which it issued, are wholly over, are properly to be addressed to the discretion of the chancellor if they are valid. There can be no question under the authorities as to the right of the court to make its injunction permanent.

As the court said in United States v. Workingmen's Amalgamated Council of New Orleans, 54 Fed. Reporter, 994, in a similar case: "Rights do not ebb and flow. * * * The question is, what was the state of facts at the time of and prior to the filing of the bill, or whether, if the facts alleged in the bill were true at that time, there was need of an injunction." Any rule which made it erroneous for a chancellor, in view of a situation like this, to render his injunction permanent, would be manifestly dangerous. Temporary but disingenuous compliance with the terms of an interlocutory injunction, with the reserved purpose to renew unlawful action after the final hearing, might completely paralyze all the power of the court to grant adequate relief. And it may well be said in this case, that as we think the injunction forbade nothing but actions, in themselves

unlawful, there can certainly be no practical harm in its continuance against any persons who are not now engaged in such unlawful actions and do not intend to be so in the future.

We think also that the position that the appellant is not a proper party to the injunction is untenable. The officers of the International Union, as such officers and as representing said union, were certainly advisers, counsellors, organizers and supporters of the strikers, who placed the pickets guilty of the unlawful acts which characterized the picketing. The decree finds that the appellant itself placed pickets in the streets approaching complainant's factory and in the vicinity thereof, "for the purpose of threatening, assaulting and intimidating the employees of the complainant and others."

We do not think that this finding is unreasonable under the evidence, but at all events it is not necessary to justify the inclusion of the appellant in the ordering part of the injunction. The appellant, in its official organ, published the circular or edict as the action of the Local Union No. 1, "for the purpose of establishing a so-called boycott," "with the intent to injure the business" of appellee, which, by the act of June 16, 1887, before noted, was an unlawful "utterance." We do not understand that it is erroneous to include in an injunction of this kind some particular defendant, simply because there is not evidence to convict him of conspiracy. The reasonable fear of the defendant's participation in unlawful action caused by his attitude and temper, may justify the injunction before he has done anything unlawful. In the case at bar, under the circumstances shown by the record, the appellee might well reasonably fear that appellant would endeavor to establish a boycott, by calling a strike for that express purpose, as was threatened. While to strike for any cause or no cause, is not unlawful, to issue a strike order for the purpose of establishing a boycott on some person's goods, with the intent thereby to injure his business, and thus bring him to desired terms *is*, under the statute of 1887, unlawful.

The decree will be affirmed. We are asked to order that

the costs of the supplemental abstract filed by appellee be taxed against the appellant. We found this supplemental abstract to be proper and necessary in view of the insufficient character of the original abstract filed by appellant, and therefore do so order under the rule, that its cost be taxed against the appellant.

                                                    Affirmed.