## Somat Corporation v. Combs

*Richard P. Brown, Jr.*, and *Rogers & O'Neill*, for plaintiff.

*Gordon W. Gerber* and *MacElree, Platt, Marrone & Harvey*, for defendants.

KURTZ, J., May 25, 1966.—The pleadings in this case consist of plaintiff's complaint, defendants' answer with new matter and a counterclaim.

In the complaint, it is alleged that plaintiff corporation had been and was engaged in the business of designing, manufacturing and selling certain unique and novel machines to be used in the destruction and disposal of waste, such as food waste (garbage), office waste (waste paper, typewriter ribbons, etc.), industrial waste, such as the waste material generated by manufacturing plants, and the worn out fiber beer cases of a brewer, and classified information and the like which various agencies of the government accumulate and no longer have use for; that some of its former employes, individual defendants in this action, had left its employ and were undertaking or about to undertake the design and manufacture of the same machines or

machines embodying the same mechanical and scientific principles by making use of trade secrets which they had learned and acquired while in plaintiff's employ. The corporate defendant, it was alleged, was the agency through which the individual defendants would operate in this undertaking.

The complaint also averred that defendants Combs and Craig, on dates therein set forth, had executed and delivered to plaintiff stock option agreements, under the terms of which they bound themselves to remain in plaintiff's employ for a period of at least two years, and that they had left plaintiff's employment within the two-year period; that all of the individual defendants had executed and delivered to plaintiff agreements designated "Agreement as to Patents and Inventions", which required them to and did, in fact, assign to plaintiff any patents or inventions discovered by defendants while so employed, and that they intended to breach the obligations which those agreements placed upon them.

It was also charged that defendants Combs and Craig, the former having been plaintiff's president and the latter its vice-president, and both of whom had been directors, had, commencing on or about June 16, 1965, the date which it later developed was crucial in the lives of the various principals herein because of certain happenings which transpired at a directors' and stockholders' meeting of plaintiff corporation held in New York, entered into a conspiracy to terminate their employment with plaintiff, in violation of their agreements; to establish a new business in competition with plaintiff; to remove information, documents, designs, drawings, techniques, patents and like matters from the possession of plaintiff; to endeavor to remove from plaintiff's employ a large number of its management, supervisory and skilled personnel; and to endeavor to destroy plaintiff as a going business concern

in order to obtain for themselves the business which plaintiff had theretofore conducted.

It was alleged that, pursuant to that conspiracy, certain activities along the lines charged were undertaken, and that unless these defendants were restrained, they would continue in this activity in violation of their agreements and the law, thereby causing plaintiff damage "in amounts which are substantial but not readily ascertainable or calculable", and that plaintiff's damage would be such as was "not compensable by money damages and hence irreparable"; consequently, said plaintiff, it had no adequate remedy at law.

Plaintiff sought the issuance of injunctions, both preliminary and permanent, restraining defendants from the continuance of this type of activity. . . .

Defendants' answer put the allegations of the complaint in issue by denying that plaintiff was possessed of trade secrets; first, because the methods and techniques which it employed were not novel or unique, but were well-known in allied fields of industry; and next, because by the sale of said machines and the distribution of sales literature and drawings which were distributed to customers in connection with those sales, the information and data which plaintiff now seeks to prevent defendants from using has become disseminated and known to an extent where, if it ever was secret, it is no longer such. The answer challenged the effectiveness of the contracts upon which plaintiff based its claims for the purposes for which plaintiff sought to use them. It denied the existence of a conspiracy, as alleged by plaintiff, and denied that defendants were in possession of any papers, documents, data or other property of plaintiff of any description; consequently, said defendants, there was none such in existence which they could be compelled to return to plaintiff.

In their "New Matter", defendants asserted that the documents labeled "Agreement as to Patents and In-

ventions" were not supported by consideration, and they made the same assertion in connection with the stock option agreements. . . .

From the above resumé of the pleadings, it can be readily seen that the issues thus framed include the following: Was plaintiff the possessor of trade secrets, the use of which it could deny to defendants as constituting unfair competition? Did the stock option agreement and/or those having to do with the assignment of inventions and patents, etc., impose any restrictions upon the use by defendants of any information or other data acquired by them while still in plaintiff's employ? Has a conspiracy to destroy plaintiff's business been shown to have existed? . . .

## Discussion

Plaintiff seeks primary relief by way of injunction plus an award of damages in the form of money. The injunction sought would recognize the validity of, and give effect to, the various assignments of ideas, designs and inventions executed by the individual defendants, and restrain the misappropriation and divulgence of information which plaintiff calls trade secrets, which it alleges defendants had acquired while in plaintiff's employ, whether those secrets consisted of pricing procedures or quotation amounts, customers' lists or technical knowledge having to do with the construction or assembling of the machinery which plaintiff produces and sells.

In our judgment, no injunctive relief may be granted. . . . We do not believe that we can conclude from the testimony before us that plaintiff's customer lists, its bids or quotations, the plans and layouts of its prospective customers' buildings or plants, or the technical knowledge as to the arrangement and operation of the various components of Somat equipment, including the relationship of those components to each

other, constitute trade secrets, the use or dissemination of which can here be enjoined.

In Van Products Company v. General Welding and Fabricating Company, 419 Pa. 248, 258 (1965), a case quite similar to this one, the Supreme Court reviewed the authorities relating to the law of trade secrets and laid down the following rules:

"The concept of trade secret is at best a nebulous one and has been variously defined by case and text authority. Restatement, Torts, §757, comment b, states that 'a trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' The prerequisites to recovery upon a cause of action alleging misappropriation of trade secrets was long ago set forth for Pennsylvania in *Macbeth-Evans Glass Co. v. Schnelbach*, supra, 239 Pa. at 87, 86 A. at 691: 'To be entitled to equitable relief the burden was on [the employer] to show; (1) that there was a trade secret, or, as in the case at bar, a secret process of manufacture; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and, (4) that the secret was communicated to [the employee] while he was employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer' ".

In Pittsburgh Cut Wire Company v. Sufrin, 350 Pa. 31, 35 (1944) citing Williston on Contracts, §1646, it was said: "A man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer

and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer". In Wexler v. Greenberg, 399 Pa. 569, 576, 577 (1960), the applicable rules were stated in this language: "The principles outlining this area of the law are clear: A court of equity will protect an employer from the unlicensed disclosure or use of his trade secrets by an ex-employee provided the employee entered into an enforceable covenant so restricting his use, *Fralich v. Despar*, 165 Pa. 24, 30 Atl. 521 (1894), or was bound to secrecy by virtue of a confidential relationship existing between the employer and the employee, . . . The employer thus has the burden of showing two things: (1) a legally protectable trade secret; and (2) a legal basis, either a covenant or a confidential relationship, upon which to predicate relief". To the same effect, see Spring Steels, Inc. v. Molloy, 400 Pa. 354 (1960).

Turning next to examples of the types of information which have been held to be trade secrets in the customer information area and the types which have not, it should be observed that in Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618 (1957), customer data of plaintiff, which was both confidential and highly valuable, whether embodied in written lists or committed to memory by the employe, constituted trade secrets entitled to protection, while in Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy, 415 Pa. 276 (1964) the Supreme Court refused equitable protection to lists supplied by the employer to driver-salesmen on its dairy products routes containing the names, addresses and types of products purchased by those listed. There, the court recognized that any normal driver selling such products would know which dairies were making deliveries to other people on the streets he was serving and that a majority of the competitors' route

customers could be readily obtained by merely following the competitors' delivery trucks and noting the addresses at which they stopped. In that case, commencing at the bottom of page 283 of the opinion, it was also pointed out that in Morgan, the information in question was of a kind which had been compiled by the employer through material investment of its time and money, and, being highly confidential, constituted a valuable asset. In Colteryahn, it was noted that the type and extent of contact between the company and the customer was sufficiently different in that it was more personal in nature and with the salesman himself, to justify a different result.

When judged by these standards, and compared to the examples cited, the customers' lists involved in this case have not been shown to be the subject of equitable protection. Most plainly, they are not secret. Plaintiff itself has published the names of many of its customers in the sales literature which it distributes. That hospitals, restaurant chains, those industries having large quantities of waste paper or confidential material to destroy and dispose of, and governmental agencies have a need for the type of machinery which plaintiff makes is a matter of common knowledge apparent to anyone willing to take the time to make the necessary observations. Where new construction of the types mentioned is being undertaken, and by whom, are matters concerning which information is widely disseminated. Architects, food handling consultants, consulting engineers and the like are all fair game for a salesman promoting this type of equipment. On this ground, then, the failure of plaintiff's customers' lists to qualify as being either secret or confidential impels us to refuse to enjoin their use by defendants now before us.

However, plaintiff also contends that another type of customer information, i. e., the knowledge of a customer's requirements and the plans and layout of his

buildings and installations which these defendants acquired while in its employ, meet the tests for determining the existence of a trade secret, and that for that reason, these defendants should now be enjoined from soliciting the business of its customers and prospects who are within that class. On this phase of the case, plaintiff relies upon the case of Robinson Electronic Supervisory Co., Inc. v. Johnson, 397 Pa. 268 (1959), in which two former employes of plaintiff corporation were enjoined "from business contacts or soliciting of 'those persons or companies with respect to whom either of (them) on behalf of plaintiff had analyzed premises, in person or from diagrams submitted by other employees of plaintiff, and had actually made from said analysis or diagrams a determination of the basic nature of the installation to be made, the labor and material cost to plaintiff, or the appropriate price to be quoted to said person or company' for one year from the date of their resignations of employment from plaintiff, 'or, until the present contracts for supplying central station alarm service to such persons or companies shall terminate or expire and new contracts shall thereafter be entered into for said service, whichever time period shall be the shorter' ". . . . (This quote from opinion of court below—unreported).

We think the distinction between Robinson and this case is readily apparent. In the former, defendants, ex-employes of a company which provided centrally controlled burglar and fire alarm service to banks and other like establishments requiring a specially designed type of protection system, were enjoined for a fixed period or for a shorter period, if the life of the existing service contract with plaintiff was less than that fixed, from soliciting those customers with whom plaintiff had a contract or stood the chance of obtaining one, because those defendants had obtained a peculiar knowledge of each customer's particular requirements

through their employment by plaintiff. There, the only way the pertinent information concerning the customer's needs could be obtained was through an inspection and diagramming of the customer's establishment. Each prospect's requirements differed to some extent, depending upon the kind of building it occupied and its location, the location of the point of greatest risk within such building, and the type of commodity or material with which it dealt and for which it needed protection.

In this case, there is nothing unusual or unique about the types of waste generated by hospitals, restaurants, department stores, governmental agencies and the like. Each type of establishment presents the same problem in that regard; hence, knowledge concerning the requirements of one type would constitute knowledge as to the requirements of all those included within it. In addition, no technical training is required for one to know that garbage disposal equipment should be located in that part of the kitchen devoted to the washing of dishes and other cooking utensils, or that the location of this kind of equipment in a department store ought to be in that area in which the waste paper and other waste material are collected for disposal. The extractor component of plaintiff's equipment ought to be positioned in such a way as to make it easily accessible to the trucks or other transportation which will haul the pulp itself away from the building. On new construction, plans showing the locations of a prospect's various operations are readily available in the plans rooms of architects and contractors. In existing structures, an on-site examination will quickly provide the data required. Bids upon governmental projects must meet very definite plans and specifications. All interested parties have ready access to such plans. The public interest requires that they be widely disseminated.

When it is observed that about half of plaintiff's business is derived from the sale of the "IS" series, a ready-made machine in which the pulper and extractor are connected as an integrated unit, and when it is further realized that in practically all instances, the prospect's requirements are initially determined by a salesman in the field who possesses no particular technical training or experiences, and that his recommendation is then checked by the engineering department only as a double check, concurrence in the salesman's recommendation being the rule and not the exception, it is clear to us that the reasons which prompted the lower court to issue an injunction in Robinson are not present here.

Neither do we think that defendants' knowledge of plaintiff's prices or the amounts of its bids already submitted upon particular projects can be called trade secrets. We need not repeat here that which we have described in our findings of fact outlining the pricing procedures. Prices on standard items of equipment have been and are being published by the company in its sales brochures. Comment b to §757 of the Restatement, Torts, quoted in the Van Products case, says further: "It (a trade secret) differs from other secret information in a business (see §759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract . . . or the like". Once the bid or quotation is communicated to the customer, it is no longer secret, and even in those cases in which secret bids are submitted to be opened at the same time as all others secured upon the same request for bidding are opened, further negotiations with the one to whom the bid was submitted or the contractors or subcontractors upon the job is not uncommon. This is evidenced by the testimony upon this record as to the later communications

from the general contractor, the Volpe company, of the Federal government for the construction of the Suitland, Maryland, installation. This points up the reality that even after secret bids are opened and their contents become public information, the sale is not yet made.

We must next consider the trade secret phase of this case which seeks to enjoin the use of technical information possessed by defendants regarding the makeup and assembly of Somat machinery as such. In that connection, we think that plaintiff's position might be best stated in the words of its counsel, reported in the record in a statement to the chancellor made at the beginning of the hearing of August 27, 1965. He then said: "The position that I think we should and do take . . . is not that each one of the component parts or elements which is set forth in each of the claims (those being the claims contained within the various patent applications in evidence) is a secret or is novel, not known outside of Somat, the position we do take is that it was the Somat work, the time, the money, the engineering know-how over a period of two or three years which resulted in producing the combination of these elements and the relative positioning of these elements with respect to each other which is not known outside of Somat . . . the issue which we would be trying today is whether the combinations of elements shown here are novel and not known outside of Somat, and we would avoid all this question as to whether one person's ear (a part of a Somat pulper) is the same or different than Somat's, or one person's impeller (another part) is different or is the same as Somat's impeller".

In the report of the Van Products case, supra, decided after the hearing date mentioned above, but which has a very important application in this decision, the Supreme Court enumerated the various kinds

of information which the lower court in that case concluded constituted trade secrets. Starting at the bottom of page 255 of the opinion, that enumeration included, inter alia, "the 'know-how' of the manufacture, operation and functioning" of the device there being considered; "the idea and the original concept" of that device; "the intimate knowledge of the need, use and demand" for the product; that "information derived from building up and maintaining intimate card files on customers and their peculiar problems and needs, and in servicing such customers"; "the secret of the dessicant (a chemical agent employed in the process), namely, the impregnation of a soluble pellet holding material with other hydroscopic materials"; the "mechanical secrets of the 'device' involving peculiar knowledge of design, material, dimensions and positioning of baffles, orifices, screens, and supports other than those disclosed in sales literature or patents or otherwise in the public domain". At page 257 of the Supreme Court's opinion, the following quotation from the opinion of the lower court appears as follows: " 'The trade secret here involved . . . is all embracing rather than confined to any one particular item . . . or to any particular phase of its functioning . . . It is not any one of these features or any others which constitute the trade secret contended for by (plaintiff) but rather the whole picture combining the original idea or theory as worked up mechanically by (plaintiff) into a tangible and marketable product and the know-how all along the line . . .' "

Of these findings and conclusions of the lower court, the Supreme Court said, commencing at page 257 of its opinion: "It is our considered judgment that the lower court erred in concluding that the facts established a misappropriation of a legally protectible trade secret". Again, at page 261 it was said: "The question still remains to be answered whether the information is

such here that we must act as a judicial eraser to blot out Rapp's [plaintiff's ex-employe and a defendant] knowledge and skill".

After discussing certain specific findings of the court below, which have little, if any, application to the question which we must resolve, the Supreme Court directed its attention to what it called (page 263) : "[t]he key to the lower court's thinking:" which it said was the " 'know-how in manufacturing . . . which (plaintiff) only achieved after years of success and failure, mistakes and corrections . . . [etc.].' Along with 'trade secret', the concept of 'know-how' is also a very fuzzily defined area, used primarily as a shorthand device for stating the conclusion that a process is protectible. It covers a multitude of matters, however, which in the broad sense are not protectible, e. g., an employee's general knowledge and skill. A manufacturing company is merely the sum of its producing units, including the skills of its employees". The Supreme Court then concluded that even though that plaintiff possessed a precise knowledge of the field of air driers, the product it sought to protect, as Somat seeks to protect its pulper and extractor here, that knowledge was derived from the inventiveness and industrious experimentation of two of its employes, one of whom was a defendant in that case, and that for that reason its " 'know-how' was not protectible from exploitation" by defendant where experimentation made it possible.

Regarding the finished product which the Van Products Company produced and sold, the Supreme Court pointed out, commencing at page 265 of its opinion, that they "were sold on the open market and described and covered extensively in the trade literature and (plaintiff's) own advertising media. And there is considerable authority to the effect that public sale of the article in question or the description thereof in literature available to the public will destroy any trade secret which the inventor might have had".

We think that a comparison of the instant case to the one from which we have just quoted demonstrates the remarkable similarity between them. Without enumerating the individual points of similarity at length, we believe it is sufficient for us to say that the principles which Van Products recites have the same application here as they had in that case. In our judgment, the application of those principles to this case makes it clear that the technical and mechanical knowledge possessed by these defendants is not a trade secret, and for that reason, their use of or dissemination of that knowledge cannot be enjoined.

The next question is: Has it been shown that two or more of the individual defendants have entered into a conspiracy either to misappropriate plaintiff's trade secrets and use them to plaintiff's disadvantage or to destroy the plaintiff as a going and operating business? Since we have already decided that there are no trade secrets in this case, that part of the question has been answered.

In Noerr Motor Freight, Inc., v. Eastern Railroad Presidents Conference, 155 F. Supp. 768, 814 (E. D. Pa. 1957), a conspiracy was defined, and the law relating to civil liability for acts committed in furtherance of a conspiracy was reviewed as follows: "An unlawful conspiracy has been defined as a combination between two or more persons to do an unlawful or criminal act, or to do a lawful act by criminal or unlawful means. Duplex Printing Press Co. v. Deering, 1921, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349. A lawful act may, when done by many in concert, become a conspiracy and public wrong and may be prohibited. Bedford Cut Stone Co. v. Journeyman Stone Cutters' Assn. of North America, 1937, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916. An unlawful conspiracy may be formed without simultaneous action or agreement on the part of the conspirators. Interstate Circuit, Inc., v. United States, 1939, 306 U. S. 208, 59 S. Ct.

467, 83 L. Ed. 610. The civil liability for acts of conspiracy flows from the damages caused by the acts committed pursuant to the formed conspiracy; accurately speaking, there is no such thing as civil liability for conspiracy as such; and unless something is actually done by one or more of the conspirators which results in damage, no civil action lies. 11 Am. Jur. §45, p. 577, and cases there cited".

We would point out first that we can find no evidence on this record which would support a conclusion that two or more of these defendants have joined together or agreed to do an unlawful or criminal act or to do a lawful act by criminal or unlawful means. On the contrary, in our view, the evidence more readily sustains the conclusion that Combs, Craig, MacEachern, Kirkbride and Warner, being dissatisfied with the policies and methods of their employer, set out to establish a competing business which, through the application of their own ideas and industry, they hoped to make successful, even to the point, perhaps, of forcing Somat out of business. As a competing business would become more successful, those with whom it competed could be affected adversely. We do not believe and are not willing to say that such action on the part of the departing employes, or that an agreement among them to obtain such a result, can be adjudicated a conspiracy within the meaning of the definition quoted above.

But even if we assume, for the purposes of this discussion, that the existence of a conspiracy has been established, we cannot find that anything done in the way of inducing or seeking to induce plaintiff's employes to leave its employ resulted in harm to plaintiff. It is true that offers and overtures were made to certain of Somat's key personnel; witness the testimony of McKibben and Mrs. Work in that regard; but both of these key employes are still working for Somat, and their loyalty and devotion to their jobs has never

wavered, so far as we can observe throughout this entire controversy. The same may be said of their overtures to Tahar, Rogalsky, Hilbert and the rest.

Plaintiff argues that as officers and employes of plaintiff, defendants, and particularly Combs and Craig, owed an allegiance and fidelity to it which they violated by their actions. That argument may have validity when we consider the question of the damage claims which plaintiff has presented against the individual defendants and which came into the case after the hearings had started. However, since we are now dealing with the allegation of a conspiracy to plunder and destroy, we must conclude, first, that no such conspiracy has been established by this evidence, and second, that even if its existence has been established, no acts committed pursuant to its purpose have been shown to have caused damage which would entitle plaintiff to equitable relief.

We turn next to a consideration of the various assignments executed and delivered to plaintiff by the various individual defendants. The findings of fact indicate that at or shortly after each defendant commenced his employment with Wandel or Somat, as the case may be, he executed an agreement which recited, inter alia: "I am about to enter or continue in the employ of WANDEL . . . and in such employment will or may become informed as to many of its procedural and mechanical needs, problems, developments and projects . . ." Each contract then provided:". . . in consideration of the premises and of said employment being given or continued and the compensation therein: (1) I hereby agree . . . to assign, transfer and set over, and I do hereby assign, transfer and set over to Wandel, its successors and assigns, all my rights, title and interest in and to any and all designs, ideas, inventions and improvements which I, either solely or jointly with others, have conceived, made or

suggested, or may hereafter conceive, make or suggest during my employment by Wandel or its successors and the six-month period next following the termination of such employment, and which in any way relate directly or indirectly to its business problems, procedural, mechanical and commercial needs, and production, research or experimental developments and projects of every name and nature under consideration and/or being carried on by or for Wandel prior to termination of my employment". This contract was under seal.

In addition, Craig and Combs, together with other Somat employes not involved in this case, executed assignments to Somat in connection with the making of patent applications, the last of which was made as late as March 15, 1965. Each of these assignments contained these words: "FOR ONE DOLLAR ($1.00) and other valuable consideration . . . I, . . . being a joint inventor with . . . , of certain improvements in a WASTE DISPOSAL UNIT, hereby assign unto SOMAT CORPORATION . . . my entire right, title and interest in and to such invention, together with the patent rights and rights of protection of the same throughout the world . . ." These assignments further provided: "And I covenant, agree and warrant that I have a full and unencumbered title to my interest in the invention hereby assigned. I further covenant and agree that I will, at any time upon request, without further compensation, execute and deliver any and all papers or instruments that, in the opinion of SOMAT CORPORATION, may be necessary or desirable to secure to said assignee the full and complete enjoyment of the rights and properties herein conveyed or intended to be conveyed".

Defendants contend that the assignment provisions of the original contracts are unenforceable because they are not supported by consideration in that these

defendants had already been employed by Somat or its predecessor at the time the agreements were signed; Somat, they say, gave up nothing for the promise to assign or for the assignment itself. They argue also that the seals upon these contracts do not import consideration because actual consideration is necessary to support such a promise. As these agreements bear upon the obligations of Combs and Craig, they argue that each of those defendants had resigned on other occasions prior to the one involved in this case, and that these resignations terminated any duty to assign which their respective contracts might have imposed upon them, even though there was no actual cessation of work or loss of time or pay as a consequence. In that connection, it is pointed out that no reaffirmations of these contracts were made by either Combs or Craig following such resignations and after their prior differences with Somat had been patched up and resolved.

Regarding the assignments attached to the patent applications, it is urged that they amount to no more than an authorization by the inventors, Combs and Craig, for Somat to make an application for a patent or patents, and that, until a patent has been issued, there being no restriction upon defendants' use of the invention within the writing, they may, as may anyone else acquiring knowledge of the Somat concept and design, including Somat itself, use the ideas, designs and inventions as they see fit.

We think that most of the positions asserted by defendants need not now be discussed. We have finally come to the belief that the assignments in question, whether they be those contained in the original agreements relating to patents and inventions, or those signed by Combs and Craig only which were attached to the patent applications, did not transfer or convey an exclusive right to plaintiff to exploit and market the inventions so assigned in the absence of a showing that

the inventions themselves were secret, hence, trade secrets, or that a restrictive covenant limited the assignors' rights to so use them. Although it seems incongruous to us that one may assign all of his right, title and interest in an invention at a time when he and his assignee are enjoying an harmonious relationship, and then on another day, when that harmony has dissolved, can apply all of the ideas and inventions he had undertaken to assign to his own use and profit, pending the issuance of a patent to the assignee, such would seem to be the legal result of such a situation. The case of M. J. Lewis Products Co. v. Lewis, 57 F. 2d 886 (1931), a case which is identical on its facts with this one, so holds.

It would appear that we fell into error when we issued the preliminary injunction in this case. At the time it issued, we believed that the assignments attached to the patent applications, being unqualified in their terms, transferred Combs' and Craig's entire interest in the invention to Somat; see Purman Estate, 358 Pa. 187 (1948), and that the whole interest transferred included the right, themselves, to exploit and make use of the invention assigned to the exclusion of the assignor's rights so to do. We have since discovered our error in that regard.

While the assignment of an unpatented invention does transfer the inventor's entire interest in it, his interest therein is only exclusive so long as its ideas, concepts and designs are his secret. After their publication, and we have found that they had been published here, and before the issuance of a patent, anyone acquiring such knowledge through lawful means may also make use of and exploit the invention; see cases cited in Lewis, supra, also Summerhays v. Scheu, 10 Cal. App. 2d 574, 52 P. 2d 512 (1935). That being the character of an inventor's property in his invention, we must now hold that in the absence of covenants

restricting defendants' exploitation of their inventions, none such may be implied; hence, the various assignments mentioned above form no basis for the issuance of the injunction here sought. . . .

## CONCLUSIONS OF LAW

1. Plaintiff has not established that it is the owner of any trade secrets, the use or disclosure of which by defendants may be enjoined.

2. Plaintiff has not established the existence of a conspiracy among defendants or any of them to plunder and destroy plaintiff as a going business.

3. Plaintiff has not established the breach of any contractual obligation assumed by any of the individual defendants which would entitle plaintiff to equitable relief.

4. Plaintiff is not entitled to equitable relief in the form of an injunction prohibiting defendants from making use of the information contained in the various patent applications which plaintiff has made, to which were attached the assignments of inventions executed by defendants Combs and Craig; neither is plaintiff entitled to such relief by virtue of the execution by each of the individual defendants of an "Agreement as to Patents and Inventions", as set forth in the findings of fact.

5. Plaintiff has not established that defendants now have possession of any tangible property of plaintiff, the return of which can be compelled through the issuance of a mandatory injunction.

6. Plaintiff has not established that it is entitled to an award of monetary damages.

7. Defendant, Austin F. Kirkbride, is entitled to a monetary award against plaintiff in the amount of $142.96, plus interest thereon at the rate of six percent per annum from July 15, 1965.

8. The injunction issued on September 3, 1965, as modified on November 8, 1965, ought to be dissolved.

9. The complaint should be dismissed, the relief prayed for denied and judgment should be entered for defendants.

10. The counterclaims of all individual defendants except the said Kirkbride should be dismissed and the relief therein prayed for denied. The counterclaim of the said Kirkbride should be sustained, as indicated above.

## DECREE NISI

And now, May 25, 1966, upon consideration of the foregoing case, it is ordered, adjudged and decreed:

1. The injunction issued September 3, 1965, as modified on November 8, 1965, is hereby dissolved.

2. The complaint is dismissed and the relief therein prayed for denied. Judgment is entered for defendants.

3. The counterclaims of all defendants except that of Austin F. Kirkbride are dismissed and the relief therein prayed for denied. Judgment is entered for plaintiff.

4. The counterclaim of Austin F. Kirkbride is sustained. Judgment in his favor against Somat Corporation is entered in the amount of $150.29.

5. Plaintiff will pay the costs.